ROBERT MASSA, Plaintiff-Appellee, v. G. HELMKAMP EXCAVATING & TRUCKING COMPANY *et al.*, Defendants-Appellants (G. Helmkamp Excavating & Trucking Company, Third-Party Plaintiff and Counterplaintiff and Appellee; C. D. Peters Construction Company, Third-Party Defendant and Appellant; L. B. Foster Company, Counterdefendant and Appellant).

Fifth District   No. 5—83—0457

Opinion filed July 8, 1986.

William G. Kaseberg, of Edwardsville, and Burton C. Bernard, of Bernard & Davidson, of Granite City, for appellant L. B. Foster Company, Inc.

Thomas W. Alvey, Jr., and James P. Leonard, both of Pope & Driemeyer, of Belleville, for appellant C. D. Peters Construction Company.

Donald J. Dahlmann and James C. Cook, both of Walker & Williams, P.C., of Belleville, for appellant G. Helmkamp Excavating & Trucking Company.

Edward J. Kionka, of Kionka & Associates, of Murphysboro, for appellee Robert Massa.

Walker & Williams, P.C., of Belleville (Donald J. Dahlmann, James C. Cook, and Anthony L. Martin, of counsel), for appellee G. Helmkamp Excavating & Trucking Company.

JUSTICE CADAGIN delivered the opinion of the court:

Plaintiff, Robert Massa (Massa), an employee of C. D. Peters Construction Company (Peters), commenced this action in the circuit court of Madison County to recover damages for personal injuries suffered in a fall at a construction site owned by A. O. Smith Corporation (Smith).

Smith acted as its own contractor and hired Peters to drive approximately 80 piles for a building addition. Peters leased a crane from G. Helmkamp Excavating & Trucking Company (Helmkamp) together with an operator, McZura, and an oiler, McZura's son. The crane lease included a becket and wedge assembly. Peters also leased a diesel pile hammer and pile-driver leads from L. B. Foster Company (Foster), which lease included the services of a field specialist, John Brown.

Massa filed a three-count complaint each against Helmkamp and Foster alleging negligence, strict liability in tort and violations of the Structural Work Act (Act) (Ill. Rev. Stat. 1983, ch. 48, par. 69 et seq.). Helmkamp then filed a counterclaim against Foster and a third-party action against Peters seeking indemnity. Following a jury trial, judgment was entered in favor of Massa and against Helmkamp and Foster in the sum of $420,000, and for Helmkamp and against Foster and Peters for indemnity.

The pile-driver leads consist of an elongated frame structure with two parallel steel tracks 52 feet in length. The pile-driver hammer and diesel engine are installed into the leads and, by virtue of V-shaped channels on its sides, fit between the slides on the leads' tracks. Whereas fixed leads are braced rigidly to the crane's boom in a fixed pile-driving position, swinging leads, used, as here, for maneuverability, are held by use of the crane's loft cable. When raised by the crane to the vertical driving position, the leads locate the hammer over the pile and act as a guide during the driving down of the pile.

A crane operating a diesel pile hammer and swinging leads holds up the leads and the hammer from the ends of two separate cables, each running upward from the equipment through the top of the boom and then down to independently operated reel-like drums of the crane. The hammer is started by the crane raising the piston while the hammer rests on the pile, and, when the piston is released, compression should start driving the pile. The starting and smooth operation of the engine is adversely affected by the loosely compacted soil under the pile and by cold weather. During cold weather it is often necessary for a worker to climb the leads to use ether to start the engine.

On December 23, 1976, the leads and diesel pile hammer were attached to the crane. Peters' workers and Biason, their foreman, Helmkamp's cranemen, and Foster's field specialist, Brown, were present when the leads were assembled and rigged to the crane. The crane operator furnished a becket and wedge shackle that was attached to the lifting yoke at the top of the leads to secure the leads assembly to the cable.

The actual assembly was done with Biason in charge. Brown, the field supervisor, instructed the workers as to the proper assembly of the equipment and the operation of the diesel hammer. Massa, the union steward on the site, told Brown to stand back and not touch anything. Biason ordered a test of the equipment by raising the leads and hammer into the air, thereby placing the connection under stress.

The following day, December 24, 1976, after four piles had been driven, Brown left the job site and did not return. Brown advised the workers to keep a visual inspection on all parts. Work continued intermittently because of holidays and bad weather conditions. On the sixth day of work, January 5, 1977, 7 of the last 11 piles had been driven before Massa fell.

A pile had been placed vertically preparatory to driving, and Massa had climbed the ladder rungs on the outside of the leads to position the hammer over the pile. The crane operator lowered the hammer, which action pushed the pile approximately 3 feet into the excavation. The leads were suspended over the excavation, which was about 7 feet deep. As the crane raised the ram or piston, Massa sprayed ether to assist in starting the engine. As the ram dropped, the pile went down faster than normal, the wedge pulled out through the top of the becket on the crane cable supporting the leads, and the leads fell into the excavation, thereby causing Massa's fall and injuries.

Although the becket and wedge were both stamped five-eighth inch, the wedge was, in fact, smaller. The difference in size was not apparent upon a casual inspection, and subjecting the wedge and becket to repeated loading would result in a failure. Seventy-six piles had been driven before the failure occurred.

The complaint against Foster in the strict-liability count was that the leads were too short and that the diesel hammer would not operate properly or run continuously. The Structural-Work-Act count charged that Foster was in charge of the construction, erection and operation of the pile driving with leads and hammer that were too short and with a hammer that was in poor condition. The negligence count alleged inadequate leads, failure of the hammer to operate prop-

erly, and the approval of an improper method of driving piles.

Plaintiff's complaint against Helmkamp in all three counts was that the becket and wedge were mismatched, the wedge was incorrectly marked, and the becket and wedge would not hold up to repeated stresses.

Foster's primary contention is that a directed verdict or judgment *n.o.v.* should have been entered in its favor on both the original complaint and on Helmkamp's counterclaim for indemnity from Foster. Such motions are governed by *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 299 N.E.2d 504.

Foster argues that it did not have charge of the construction but merely leased one part of the equipment used.

■ The definition of the phrase "having charge of" has been the subject of many decisions. In *Simmons v. Union Electric Co.* (1984), 121 Ill. App. 3d 743, 460 N.E.2d 28, we recently held that the phrase "having charge of" is a generic term that has been broadly read and requires the consideration of many factors. Among the 10 possible factors listed in *Simmons,* only two could be present here, the supervision and control of the work (erection and operation of the leads) and the ownership of the equipment used at the site. The presence of these factors is relevant, but their mere presence does not require a finding that a party was in charge of the work.

■ The fact of the lease of the equipment is not sufficient to impose liability upon Foster. (*Vykruta v. Thomas Hoist Co.* (1966), 75 Ill. App. 2d 291, 221 N.E.2d 99.) Accordingly, a finding of a violation of the Act by Foster, as supervising the work, must rest on the actions of Brown, the field supervisor for Foster. Brown was present to instruct in the assembly of the Helmkamp crane and the Foster leads and diesel hammer. Brown was instructed by plaintiff to stand back during the assembly work and apparently did not handle any item. Brown was acting more nearly as a consultant since only Biason (Peters' foreman) could actually give orders to the workers involved. The assembly was tested at the direction of Biason and visually inspected by both Biason and Brown. The expert testimony of engineers was that the mismatching of the becket and wedge was not so apparent that it would be visible to the naked eye. Biason testified that he believed the one testing of the assembly was sufficient, and he saw no need to test it again.

The facts here are insufficient in law to impose liability on Foster as having charge of the work, and the trial court should have entered judgment *n.o.v.* in its favor upon plaintiff's count based upon the Structural Work Act.

■ Plaintiff's claim against Foster in negligence and strict liability is essentially that the leads were too short for the piles being driven, the method of driving the piles was negligent, and the diesel hammer would not operate properly.

The testimony was that the 52-foot leads in question should be able to drive piles approximately 47 feet in length or shorter. The testimony of Peters' job superintendent and his field book showed that no pile was longer than 27 feet, and when piles were spliced into the top of piles already driven, the above-ground measurement never exceeded 27 feet. The testimony as to the length of the leads was undisputed.

Plaintiff testified that it was difficult to start the hammer and that he was required to climb the leads to inject ether. It was also necessary that he climb the leads to position the hammer over the pile before driving commenced. To impose upon Foster strict liability for a defective product, we recognize that plaintiff is not required to prove a specific defect (*St. Paul Fire & Marine Insurance Co. v. Michelin Tire Corp.* (1973), 12 Ill. App. 3d 165, 298 N.E.2d 289), and that plaintiff's burden of proof may be established by showing that the product malfunctioned and by excluding other reasonable causes (*Tweedy v. Wright Ford Sales, Inc.* (1976), 64 Ill. 2d 570, 357 N.E.2d 449). The evidence was that cold weather causes difficulties in starting diesel-powered hammers and that firm resistance of the ground to penetration by the pile is necessary for the hammer to develop sufficient compression to fire. All agreed that the weather was cold and that the ground was soft.

Massa and a fellow worker testified that the weather was not responsible for the hammer problems but that the hammer was old and in poor condition. The other witnesses testified that the soft ground alone could be responsible for the problems with the hammer. Viewing the evidence in the light most favorable to plaintiff, as required by *Pedrick*, we find that there is insufficient evidence to exclude other reasonable causes of the diesel hammer's failure to start. See *Erzrumly v. Dominick's Finer Foods, Inc.* (1977), 50 Ill. App. 3d 359, 365 N.E.2d 684.

Biason used a method of driving piles while the leads were suspended in the air rather than being placed on the ground. The evidence is undisputed that Biason was completely in charge of the pile-driving operation. The plaintiff took orders only from Biason, and when Foster's employee, Brown, had offered instructions earlier when the assembly was made, the plaintiff himself told Brown to back off and not touch anything. As lessor of the equipment, Foster was not in

charge of the pile driving and had no duty to approve or disapprove of the methods selected by Peters' foreman, Biason. Brown was there to advise concerning what actions should be taken, but liability may not be imposed because his advice was not heeded. The lease agreement between Foster and Peters provided: "The Field Specialist (Brown) supplied with the equipment, shall only advise as to the proper operation of the equipment. He shall not be required to do any work not related to the equipment, nor shall he or Foster be responsible for the purpose or the manner in which the equipment is used by the lessee."

■■ ■ The trial court admitted the lease into evidence but would not allow testimony as to the duties of the field specialist or allow the language quoted above (that appears on the back of the lease agreement) to the jury. This was error. Those matters were relevant to the issues at trial and should have been admitted for they furnished further evidence that would tend to exonerate Foster from liability to plaintiff or Peters in negligence.

There being insufficient evidence under any of the counts of plaintiff's complaint directed to Foster, Foster's motion for judgment *n.o.v.* should have been allowed.

Since Foster is not liable on the complaint, it follows that there is no liability on the indemnity action of Helmkamp, and Foster's motion for judgment *n.o.v.* on the indemnity action should also have been allowed.

■ We turn to Peters' contention that its motion for judgment should have been allowed against Helmkamp's claim for indemnity. Although in three different theories, all counts were based on the allegation that the becket and wedge were mismatched and that this was the proximate cause of plaintiff's injuries. A general verdict was entered in plaintiff's favor against Helmkamp. Since the incident giving rise to this action occurred prior to March 1, 1978, contribution is not applicable, and the action is based on common law active/passive indemnity principles. *Gunderson v. Goodall Rubber Co.* (1983), 120 Ill. App. 3d 748, 458 N.E.2d 1099.

The jury answered "yes" to this special interrogatory submitted by Helmkamp: "Do you find that the becket and/or wedge was unreasonably dangerous in a manner as described elsewhere in these instructions at the time it left the control of the defendant, Helmkamp?"

The supplier of an unreasonably dangerous product is not entitled to indemnity from a subsequent user of that product such as an employer. Such a party is actively negligent as a matter of law and is

not entitled to indemnity from those "downstream" in the distributive chain. *Kosovrasti v. Kux Machine Co.* (1978), 58 Ill. App. 3d 892, 375 N.E.2d 832; *Burke v. Sky Climber, Inc.* (1973), 13 Ill. App. 3d 498, 301 N.E.2d 41.

■ The jury found in the special interrogatory that Helmkamp was actively negligent in furnishing an unreasonably dangerous becket and wedge that was used in the construction process. This mismatched becket and wedge was not apparent to an observer and was not noticeable by an inspector prior to assembly. The active negligence of Helmkamp precludes their recovery against Peters, and Peters' motion for judgment against Helmkamp's claim for indemnity should have been allowed.

We note the very recent supreme court decision in *Allison v. Shell Oil Co.* (1986), 113 Ill. 2d 26, that implied indemnity among joint tortfeasors based upon an active/passive distinction is no longer viable. However, in view of the result we reach, we need not consider that decision.

Both defendants contend that the closing argument of plaintiff constitutes reversible error. The jury was instructed to answer five special interrogatories, three involving ultimate issues of fact concerning Massa's three theories of liability against Foster, a fourth involving an ultimate issue of fact concerning Massa's claim against Helmkamp, and the fifth concerning Helmkamp's indemnity claim against Foster. The first four, if answered "yes," would allow Massa to recover from Foster and Helmkamp; the fifth special interrogatory, if answered "yes," would allow Helmkamp's indemnity claim against Foster.

During closing argument and prior to discussing damages, plaintiff's counsel told the jury:

"The Court is going to give you, along with your verdict form, some Special Interrogatories, asking you some questions about issues in this case. And, if your verdict is for the Plaintiff, Mr. Massa, then the only way that you can answer those questions is yes. There will be four questions and if your verdict is in favor of Mr. Massa, you should answer all those questions yes."

After arguing damages, plaintiff's counsel returned to the same theme saying:

"I suggest to you that a verdict and the figures [in] that range we've talked about will be reasonable and fair for this man's case. I suggest to you that that verdict should be returned by you and that in conjunction with that verdict, if you

want Mr. Massa to recover in this case, you should answer the special Interrogatories yes. I can't stress enough you have to answer the Special Interrogatories yes."

Defense counsel objected, moved for a mistrial, which motion was denied, and moved the court to instruct to jury to disregard the argument, which motion was also denied.

All parties cite *Sommese v. Maling Brothers, Inc.* (1966), 36 Ill. 2d 263, 222 N.E.2d 468, in which the supreme court found that prejudicial error was committed by plaintiff's attorney's informing the jury during closing argument that the special interrogatory had been "slipped in" by the defendant, that the jury's answer to the special interrogatory supersedes the general verdict and that the answer to the special interrogatory should be in harmony with the verdict.

> "This argument improperly informs the jury of the source of the interrogatory, (*Williams v. Norman,* 347 Ill. App. 181,) and defeats the purpose of a special interrogatory by advising the jury to conform its answer to its verdict so as to protect the verdict without regard to the evidence." (*Sommese v. Maling Brothers, Inc.* (1966), 36 Ill. 2d 263, 266-67, 222 N.E.2d 468, 470.)

The *Sommese* court further stated:

> "It is generally recognized that the function of a special interrogatory is to require the jury's determination as to one or more specific issues of ultimate fact and is a check upon the deliberations of the jury. 'Special interrogatories are used for the purpose of testing the general verdict against the jury's conclusions as to the ultimate controlling facts.' *Wise v. Wise,* 22 Ill. App. 2d 54, 58.
>
> ***
>
> *** It is clear that the plaintiff's attorney improperly alerted the jury to the fact that its decision to assess damages would be nullified by an affirmative answer to the interrogatory. Thus, the safeguard against a jury awarding damages out of passion or prejudice or sympathy without first making specific factual determinations and then applying the law thereto was thwarted." *Sommese v. Maling Brothers, Inc.* (1966), 36 Ill. 2d 263, 267-68, 222 N.E.2d 470-471.

In *Sutton v. Peoples Gas, Light & Coke Co.* (1970), 119 Ill. App. 2d 471, 474, 256 N.E.2d 19, 20, plaintiff's counsel argued to the jury:

> " 'Well, I might say this to you folks, if you answer that question "yes" then no matter what the verdict is that you want to give or will give on the large form of verdict you will be asked

to sign, if you answer that question "yes" that she was, no matter what else you say this little girl will get nothing.' "

In addition, the court stated to the jury that the interrogatories must be "consistent" with the verdict. (119 Ill. App. 2d 471, 474, 256 N.E.2d 19, 20.) A verdict for the plaintiff was reversed.

In *Swanson v. Chester Johnson Electric Co.* (1955), 5 Ill. App. 2d 175, 124 N.E.2d 304, an oral instruction to the jury that the verdict should be compatible with the interrogatory was held to be error.

In *Moore v. Checker Taxi Co.* (1971), 133 Ill. App. 2d 588, 592, 273 N.E.2d 514, 517, plaintiff's attorney argued to the jury:

"'[O]ne of the inquiries that will be given you by His Honor, Judge Paschen, is a special interrogatory which says, "Do you find that the Plaintiff, Allen Moore, was guilty of any negligence which proximately contributed to the cause of the injury complained of?" If you believe that he was not guilty of negligence that caused this accident, you should answer "No" to that inquiry, because if Allen Moore was guilty of negligence, then he can't recover and they are right.'"

This court found no error in this argument since

"[a]s long as the attorney refrains from stating that the answer to the interrogatory should agree with the general verdict, he has the right to suggest how it should be answered." 133 Ill. App. 2d 588, 593, 273 N.E.2d 514, 517-18.

In *Burns v. Howell Tractor & Equipment Co.* (1977), 45 Ill. App. 3d 838, 848, 360 N.E.2d 377, 385, the following argument was held not to be error:

"But under the law, certain special Interrogatories will be submitted to you. One of them has to do with us, and [plaintiff], particularly, and it says generally, 'Was [plaintiff] guilty of contributory negligence before and at the time of this injury which proximately caused his injury?'

I say to you, you have to answer that Interrogatory 'No.' It is very, very important that you answer that interrogatory 'No,' because [plaintiff] was exercising ordinary care at the time that an ordinary person would do. I say under the circumstances, with his experience, and his knowledge, and the particular situation, he was doing what the ordinary person would do. He is going along. He is looking down the side, and he didn't see that, and his injury was not caused by his fault, but it was caused by the fault of Cook County and Howell, who knew, or should have known that this piece of equipment would be used in this manner, and he wasn't warned about it. He

wasn't told about it, and it was not his fault that he was hurt.

But if you answer that interrogatory any way than 'No,' then you are saying, 'It is his fault and he can't recover.' "

The *Burns* court went on to say that counsel for the plaintiff was merely arguing his view of the evidence and what answer to the interrogatory would be consistent with that view. A suggestion to the jury as to how the special interrogatory should be answered is not error, the court continued, citing *Moore v. Checker Taxi Co.* (1971), 133 Ill. App. 2d 588, 273 N.E.2d 514, so long as the jury is not told to conform its answer to its verdict.

An argument that asked that a special interrogatory be answered in a certain way " 'and as a result of that, that you return that verdict' " was held impermissible in *Ramsey v. Greenwald* (1980), 91 Ill. App. 3d 855, 858, 414 N.E.2d 1266. This was found to be more than a suggestion to the jury.

■ The argument of plaintiff's counsel in the case under consideration is more than a discussion of the evidence; it constitutes a suggestion as to how the questions should be answered in order to conform to a verdict for the plaintiff. The jury was told:

"[T]he Court is going to give you, along with your verdict form, some Special Interrogatories, asking you some questions about issues in this case. And if your verdict is for the Plaintiff, Mr. Massa, then the only way that you can answer those questions is yes. There will be four questions and if your verdict is in favor of Mr. Massa you should answer all those questions yes.

* * *

*** I suggest to you that a verdict and the figures [in] that range we've talked about will be reasonable and fair for this man's case. I suggest to you that that verdict should be returned by you and that in conjunction with that verdict, if you want Mr. Massa to recover in this case, you should answer the Special Interrogatories, yes. I can't stress enough, you have to answer the Special Interrogatories, yes."

This constitutes an impermissible linkage between the verdict and the special interrogatory. Thus, the safeguard against a jury's awarding damages out of passion, prejudice, or sympathy without first making specific factual determinations and then applying the law was thwarted. *Sommese v. Maling Brothers, Inc.* (1966), 36 Ill. 2d 263, 222 N.E.2d 468.

For the reasons stated the judgment for the plaintiff against Foster entered upon plaintiff's complaint is reversed, the judgment for

Helmkamp against Foster entered upon the amended counterclaim of Helmkamp against Foster for indemnity is reversed, the judgment for Helmkamp against Peters entered upon Helmkamp's third-party complaint against Peters is reversed and the judgment for plaintiff against Helmkamp entered upon plaintiff's complaint is reversed and remanded for a new trial.

Reversed in part, reversed and remanded for a new trial in part.

KASSERMAN, P.J., and JONES, J., concur.