ROBERT L. O'NEIL *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. CONTINENTAL BANK, N.A., *et al.*, Defendants-Appellants and Cross-Appellees.

First District (6th Division)   Nos. 1—93—3123, 1—93—3124 cons.

Opinion filed February 16, 1996.—Rehearing denied April 1, 1996.

328

Kirkland & Ellis (Thomas O. Kuhns, David J. Zott, and L. Roger Boord, of counsel), and Mayer, Brown & Platt (William E. Deitrick, Roy T. Englert, Jr., and Alan E. Untereiner, of counsel), all of Chicago for appellants.

Kevin M. Forde, Ltd. (Kevin M. Forde and Mary Anne Mason, of counsel), and Richard J. Prendergast, Ltd. (Richard J. Prendergast, of counsel), all of Chicago for appellees.

PRESIDING JUSTICE ZWICK delivered the opinion of the court:

Defendant Continental Bank, N.A. (Continental), appeals from a judgment entered following a jury trial. The jury determined that Continental and its codefendants, Pioneer Bank & Trust Co. and the Mid-City National Bank of Chicago, breached an oral contract with plaintiffs Robert L. O'Neil, Henry D. Paschen, Jr., William J. Harte and Edward T. Joyce to support plaintiffs' bid to purchase a building and parcel of real estate during a bankruptcy auction. A judgment totalling $6.1 million was entered by the trial court pursuant to the jury's award of damages. Plaintiffs counterappeal, alleging that the trial court improperly dismissed several of the counts set out in their complaint.

The bankruptcy auction around which this case centers was

conducted March 22, 1984. The principal asset of the bankruptcy estate was the Loop Hospital, a building located on the southeast corner of Franklin and Washington Streets in Chicago. Plaintiffs planned to purchase the Loop Hospital from the bankruptcy estate and then use the facility as "The Silvetti Wound Hospital and Burn Clinic" (the Silvetti Clinic). Defendants were creditors of the bankruptcy estate.

The Silvetti Clinic was to be a specialty hospital. Dr. Anthony Silvetti had pioneered the use of D-glucose polysaccharide powder in the treatment of wounds, pressure sores and burns. Although Dr. Silvetti had not obtained approval from the United States Food and Drug Administration for the commercial use of D-glucose polysaccharide powder, he anticipated such approval in the near future. By late 1983, Dr. Silvetti had used the treatment experimentally on hundreds of patients with what he characterized as "remarkable success." By 1984, he and the plaintiffs had begun final preparations for the commercial approval of the drug. The new treatment was to be the centerpiece of the facility.

At the time of the bankruptcy auction, defendants' claims against the bankruptcy estate, including appellant Continental's claim, were subordinated to $3.5 million of claims from third-party creditors. In December of 1983, a $3.5 million offer to purchase the property was submitted to the bankruptcy court by Leroy Inskeep on behalf of the Fifield Development Corporation. This offer was vigorously opposed by the defendants. In February of 1984, defendants submitted written appraisals to the bankruptcy court that indicated that the value of the Loop Hospital was $7 million if used as a hospital and clinic and $9.5 million if used as an office complex. Inskeep subsequently indicated that he would be willing to raise his offer to $3.7 million, but this offer would still have provided little or no recovery for the defendants once the claims of the third-party creditors were paid.

Following the Inskeep offer for the Loop Hospital, plaintiffs began negotiations with the defendants in order to garner their support for an offer the plaintiffs were preparing against the Inskeep bid. The parties met on February 15, 1984, in the cafeteria of the Federal Building. Plaintiff Edward Joyce explained that he and his partners intended to use the Loop Hospital as a facility specializing in wound healing using Dr. Silvetti's unique treatment. Joyce proposed that the defendants lend his group the earnest money required to tender a bid to the court. These funds could then be used to buy at a discount some of the third-party claims that were superior to the defendants' claims. The proposal further contemplated that the plaintiffs would pay as much as $5 million for the facility. If Joyce and his partners

were able to obtain the necessary State licensing to run the new hospital (collectively referred to by the parties as a certificate of need or CON), $5 million would be paid in full and the defendants would share in the proceeds of the sale, in excess of the amount necessary to satisfy the superior claims. If, on the other hand, Joyce and his partners were unable to obtain the CON for the hospital, plaintiffs would pay only the amount necessary to satisfy the superior claims (estimated to be approximately $3.5 to $3.7 million). Under the former scenario, defendants expected to split between themselves between $1.3 million and $1.5 million. Under the latter scenario, defendants would receive nothing, the same amount they would have received if the Inskeep offer were to be accepted by the bankruptcy court.

On March 12, 1984, a formal meeting was held at Continental Bank. Joyce presented his proposal for acquiring the hospital. During the meeting, a slide presentation regarding Dr. Silvetti's wound-healing process was shown. This presentation was similar to one that had already been given in Springfield to the Illinois Department of Public Health in anticipation of requesting the CON. At the meeting, Joyce asked a Continental Bank officer, William Marcou, how long it would take to get the CON. Marcou, who had experience in such matters, responded "Ten months." Joyce said "Fine. As between the banks and my partners, we'll try and get that licensing for ten months." The meeting subsequently concluded.

The court-imposed deadline for submission of offers to purchase the Loop Hospital was March 16, 1984. On March 15, Continental's Richard Ferri contacted Joyce's associate, Richard Cremieux, and informed Cremieux that Continental would agree to the plaintiffs' proposal.

On March 16, 1984, no other offers besides Inskeep's $3.5 million offer had been submitted to the bankruptcy court. During the status hearing, plaintiff Joyce advised Bankruptcy Court Judge Robert L. Eisen of the deal that had been struck with Continental, Pioneer and Mid-City and of the fact that Continental had agreed to loan $1 million to Joyce and his partners to purchase the Loop Hospital. In response to an inquiry from Inskeep as to whether the Joyce offer was contingent upon his ability to obtain a hospital license, Joyce stated: "There may be contingencies that adversely affect the banks, and they're willing to accept them." Pioneer's representative informed the court that the "highest and best offer" was Joyce's offer.

Joyce, joined by the bank representatives, requested that Judge Eisen grant two weeks to the plaintiffs to finalize their proposal. Inskeep then indicated that his clients intended to withdraw their $3.7

million bid if it were not promptly accepted. Representatives of each of the banks spoke in favor of giving plaintiffs and the banks time to draft the real estate contract and to deposit the $1 million with the bankruptcy court. Judge Eisen denied the requested two-week delay in the proceedings, but granted Joyce and his partners until Tuesday, March 20, 1984, to deposit the funds with the court and to submit a real estate purchase contract.

The parties held a meeting late in the morning on March 20, 1984, to finalize the agreement. Continental's representative, Marcou, testified that before issuing the check for $1 million, Continental required all the parties to consent to the terms of the deal. Joyce testified that, during the meeting, Marcou stated that the other banks were concerned that the plaintiffs might intentionally slow down the process of obtaining a CON in an effort to pay less for the property. Joyce told Marcou that he had relied upon Marcou's own estimate of the time necessary to obtain the CON (10 months), and asked Marcou how much time he wanted. Marcou proposed a rider to the agreement that would require Joyce and his partners to continue to seek the appropriate authorizations for the hospital facility for six months beyond the original period. Frank Wetmore, an attorney for Mid-City and Continental, expressed his view that the Joyce partnership should pay $5 million if they ever received a CON. Joyce responded that he would not accept an open-ended commitment, but that he would agree to an additional six-month extension beyond that proposed by Marcou. The parties have referred to the changes Joyce agreed to make to the agreement with regard to the time he would have to seek a CON as the "Marcou Rider." Thus, with the Marcou Rider in place, the total period of time during which plaintiffs would be obligated to pay $5 million for the property if they received a CON was 22 months: the original 10-month period proposed by Marcou, the additional six-month period during which Continental could direct plaintiffs to continue to seek authorization and the final six-month period offered by Joyce.

Once the terms of the agreement had been finalized at the March 20 meeting, Joyce stated that he would not borrow the $1 million and would not submit his offer to the bankruptcy court unless the lawyers for the banks indicated that their clients would agree to the terms of his proposal without further modification. Pioneer's attorney stated that Joyce "wanted to be assured that whatever offer he was going to make would enjoy the support of the banks." Pioneer's attorney agreed to the terms, as did the lawyer present representing Mid-City and Continental. Joyce then executed a $1 million promissory note.

After the meeting, most of the participants proceeded to court.

During the hearing, Joyce deposited the $1 million draft and submitted his revised real estate contract to purchase the Loop Hospital for $5 million. Continental's counsel stated at the hearing, "We have negotiated this thing out so that we are satisfied with the proposal that has been made by Mr. Joyce's client." Later in the proceedings the court stated, "I think that the [Joyce] offer has sufficient bona fides to take a very close look at it. And if the protection is there, I will approve it." The court then put the matter over until March 22.

After the hearing, at approximately 4:30 p.m., one of Joyce's associates, Richard Cremieux, asked whether he and Richard Ferri, a representative of Continental, should return to the office to prepare the formal written agreement. One of the Pioneer attorneys stated that it was not necessary to draw up the written agreement right away because there already was a deal in place. Counsel for Continental indicated that he was unconcerned about the court approving the deal because the parties had reached an agreement and because the court accepted Continental's escrow check. Joyce and several of the others who worked on the negotiations celebrated their agreement at the Union League Club that evening. Joyce and counsel for Pioneer discussed their successful venture over dinner.

Joyce associate Cremieux and Continental attorney Ferri began working on drafting the written agreement the following day. Each testified that no substantive changes were made to the terms of the oral agreements that had been negotiated.

When Joyce and his associate Cremieux arrived at the bankruptcy court for the hearing on March 22, 1984, Joyce noticed bank representatives talking to Inskeep in the hallway. When the case was called, Inskeep announced to Judge Eisen that his clients had authorized him to raise their bid to $4.3 million. Wetmore, on behalf of Continental and Mid-City, stated to Judge Eisen that both of his clients had determined that the $4.3 million offer better served their interests than plaintiffs' $5 million offer, which was contingent upon the plaintiffs' receiving a CON.

Judge Eisen's reaction to Wetmore's comments was immediate. He stated:

> "[T]he creditors here [are] represented by sophisticated lawyers [who] certainly know more about what would be in their interests than the Court would. Essentially *** the Court's function [is] *** similar to the way a Court would function tabulating ballots in a hearing on confirmation. It really is not fitting for a Court to substitute a business judgment for that of the creditors who are eminently involved with these financial matters."

Counsel for Pioneer then stated that he wished to have an op-

portunity to consult with his client. The matter was put over until the afternoon.

During the afternoon session, Pioneer's attorney indicated that his client supported both offers, but had a "very mild preference" for Inskeep's offer. Wetmore, representing Continental and Mid-City, stated that his clients were "still in negotiations" with Joyce. At the conclusion of the afternoon hearing, the court approved Inskeep's offer.

The jury found that defendants had breached their contract with the plaintiffs and returned a verdict in favor of the plaintiffs in the amount of $6.1 million. The jury's award was apportioned as being $4.5 million for the difference between the fair market value of the Loop Hospital and its acquisition cost and $1.6 million for the value associated with the certificate of need for the Silvetti Clinic. The jury also made the following relevant special findings: (1) there was a meeting of the minds between the plaintiffs and Continental Bank on all material terms of the contract; (2) as part of that agreement, Continental had promised to unconditionally support the plaintiffs' $5 million contingency offer when before the bankruptcy court; and (3) the plaintiffs' offer would have been approved over the Inskeep offer had Continental and the other banks supported it.

Continental raises the following arguments on appeal: (1) despite the jury's special finding that Continental and the other defendants had reached an agreement to "unconditionally support" plaintiffs' bid for the Loop Hospital, the record fails to support that determination; (2) if a contract had been formed requiring the banks to support the plaintiffs' bid, plaintiffs failed to establish that the banks' failure to do so would have had any affect upon the bankruptcy court's decision to award the sale of the Loop Hospital to the Inskeep group; (3) plaintiffs' counsel committed reversible error in comments made to the jury during his closing argument when he asked the jury to return the special interrogatories "consistent" with their verdict; (4) the jury was misinstructed on the issue of damages; and (5) the jury's award of damages is inconsistent and generates a double recovery for the plaintiffs. We address these arguments in order.

Continental first argues that the record fails to support the jury's finding of a breach of contract. Continental claims that it is entitled to judgment *non obstante veredicto (n.o.v.)* or a new trial because plaintiffs have failed to prove a meeting of the minds between it and the plaintiffs on all the material terms of the alleged contract. Although Continental concedes that the parties had reached an oral agreement as of March 20, 1984, Continental argues that a letter written by Joyce associate Richard Cremieux on March 21, 1984,

discussing "problems" with provisions relating to the CON licensing, "negated any prior understanding that the parties had reached."

■ The standard of review on appeal with regard to Continental's initial claims are well settled. We will find error and order the entry of judgment *n.o.v.* "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504.

The standard relating to the granting of a new trial differs from the standard for granting a judgment notwithstanding the verdict. (*Mizowek v. DeFranco* (1976), 64 Ill. 2d 303, 356 N.E.2d 32.) A motion for a new trial is directed to the sound discretion of the trial court who must determine whether the verdict is contrary to the manifest weight of the evidence. (*DeFranco*, 64 Ill. 2d at 310.) The trial court's decision to deny a new trial will not be disturbed on appeal unless there is a clear abuse of discretion that affirmatively appears from the record. *Duffek v. Vanderhei* (1980), 81 Ill. App. 3d 1078, 401 N.E.2d 1145.

■ A careful review of the record establishes that Continental is not entitled to either judgment *n.o.v.* or a new trial. The Cremieux letter upon which Continental centers its arguments states only that Joyce had reviewed the Marcou Rider, which lengthened the initial time period the plaintiffs would have to secure the CON. Cremieux stated that he had noticed some problems with the written draft agreements, including the fact that some of the issues that had been discussed the day before had been left out of the proposed draft. The letter indicated that the written agreement was being redrafted to include the necessary changes. Taking this evidence in the light most favorable to plaintiffs, as we must, the letter relied upon by Continental fails to undermine the jury's special finding that the parties had reached an agreement to all material terms.

The Cremieux letter demonstrates only that the parties were having drafting difficulties memorializing their agreement of March 20. Continental's arguments ignore Marcou's testimony that the parties "had an agreement as to what the terms were." Continental also ignores the language of every previous draft of the agreement, each of which referred to the "agreement of March 20, 1984." It is clear that the jury either concluded that Joyce's version of the terms of the agreement was correct and that the "problems" discussed in the letter were merely drafting problems, or that any terms left unresolved by the parties on the day of the court hearing were not material to the formation of a binding agreement. Joyce testified that

he would have agreed to the deal regardless of what the rider stated. Whichever the case, we find no error.

■ Continental next argues that, even if the record establishes that it breached an oral agreement with the plaintiffs, the record fails to demonstrate that such a breach was the legal cause of any damages. Relying upon an analogy to what it claims to be the proper rule in Illinois legal malpractice cases, Continental maintains that the proper standard of causation in this case concerns the question of whether a "reasonable bankruptcy judge" would have approved the plaintiffs' $5 million contingency offer had Continental and the other defendants supported it. Continental notes that plaintiffs' expert failed to offer any testimony as to what a reasonable bankruptcy judge would have done had they supported the Joyce bid, instead offering only testimony as to what Judge Eisen would have done had defendants followed through on their agreement. Continental's expert offered the view that the "typical bankruptcy judge" would not have approved the sale to the plaintiffs even if the defendants had offered their unconditional support for the deal.

In arguing that the trial court's judgment be affirmed, plaintiffs have argued that a subjective standard as to what Judge Eisen would have done had the defendants supported plaintiffs' offer should control; that Continental should be estopped from raising its causation claim in light of the fact that Continental itself made summary judgment motions that advanced arguments as to what Judge Eisen (and not a "reasonable bankruptcy judge") would have otherwise done; and that Continental waived the causation issue by failing to offer proper expert testimony on the objective standard. As an alternative argument, plaintiffs argue that the trial court's judgment should be affirmed on the grounds that, once it was established that defendants "materially breached" the agreement, it became the defendants' burden to offer evidence establishing noncausation, a burden the defendants clearly failed to carry in light of the jury's verdict.

Throughout these proceedings the parties have characterized the question of what the bankruptcy court "would have done" (subjective standard) or "should have done" (objective standard) had the defendants followed through on their agreement as being a question of fact for the jury's consideration. Our review of the causation issue convinces us, however, that the issue is one of law and that the trial court should have independently considered the causation issue once the jury established that the defendants had breached their agreement to support the plaintiffs' offer. This result flows from the fact that the ultimate decision of whether to adopt or reject the plaintiffs'

offer was directed to the discretion of the bankruptcy judge acting in his role as "judge," not as "fact finder." What the reasonable bankruptcy judge "should have done" is the proper causation question, a question which we properly consider on appeal *de novo*. Our reasoning in this regard is consistent with this court's holding in *Cummings v. Beaton & Associates, Inc.* (1992), 249 Ill. App. 3d 287, 618 N.E.2d 292.

In *Cummings*, a case that is similar to the case *sub judice*, plaintiffs, Central Ice Cream Company (Central Ice Cream) and the Cummings family, brought suit claiming that the defendant, McDonald's Corporation, violated an agreement to give unconditional support during a bankruptcy proceeding to a prenegotiated settlement agreement. The settlement agreement required McDonald's to pay a lump sum of $15.5 million to be split, in part, between Central Ice Cream and the Cummings family. In return for the payment, the plaintiffs agreed to release McDonald's from certain claims each of them had. Because Central Ice Cream was bankrupt, the approval of the bankruptcy court with regard to Central Ice Cream was a necessary precondition to the implementation of the agreement.

Despite the fact that McDonald's had agreed to the terms of the settlement and had agreed to urge the bankruptcy court to approve it, a McDonald's representative made statements to the bankruptcy judge during the proceedings that indicated that McDonald's would be willing to settle its claims with Central Ice Cream alone for $15.5 million, regardless of whether the claims of the Cummings family were included or not. When the bankruptcy court approved the agreement on the condition that the settlement agreement be modified so as to exclude the Cummings family's claims, the Cummings family sued McDonald's in the circuit court, alleging a breach of contract. The circuit court subsequently awarded summary judgment in favor of the Cummings family and against McDonald's.

On appeal, McDonald's argued, in part, that the trial court's decision was erroneous because there was insufficient evidence to establish that the bankruptcy court would have approved the terms of the preagreed settlement even if the McDonald's representative had unconditionally supported it. This is essentially the same claim as now made by Continental. The appellate court rejected this argument, however, calling it "inherently speculative." (*Cummings*, 249 Ill. App. 3d at 308.) The court determined that, once it was clear that McDonald's had "materially contributed" to the breach of the agreement, it was not the Cummings family that carried the burden of establishing causation, but McDonald's burden of proving noncausation. See *Cummings*, 249 Ill. App. 3d at 300-09, citing Restatement (Second) of Contracts § 245, Comment *b* (1981).

We reach the same conclusion in this case. As in *Cummings*, the facts here are not in substantial dispute once the jury determined that the defendants breached their agreement to unconditionally support the plaintiffs' bankruptcy offer. The bankruptcy court was faced with two competing bids, neither one of which was demonstrably superior to the other. The Inskeep proposal offered the benefit of greater certainty to the defendant banks, but at the cost of a significantly discounted price. The plaintiffs' contingency offer put the banks at risk that the State would fail to issue the CON to the Silvetti Clinic, but this risk was balanced by the opportunity for the banks to make a greater recovery of their initial investment in the Loop Hospital.

Under these facts, Judge Eisen's decision to follow the banks' unanimous advice and award the sale of the Loop Hospital to the Inskeep bidders was the logical decision in that it was the defendant banks alone that would reap the benefits or suffer the consequences of approval of the plaintiffs' offer. Continental and the other banks' failure to support the plaintiffs' bid was clearly a "material factor" in the court's decision to deny approval of the plaintiffs' offer. Indeed, on these facts, we must conclude that *any* reasonable bankruptcy court would have approved the plaintiffs' bid had the banks supported it as they had promised to do. Continental has offered no persuasive argument that would justify a contrary conclusion. In light of the jury's finding on the causation issue, the decision to submit the question to the jury was harmless and not grounds for reversal.

■ Continental next argues that plaintiffs' counsel injected error into the proceedings through his closing statements to the jury. The offending comments came at the very end of counsel's argument:

"I would ask you, ladies and gentlemen, to return a verdict for the plaintiffs on [each count].

I'd ask that you would carefully review the special interrogatories, answer the special verdicts and answer them *** consistent with your verdict.

I'd ask that you carefully consider the evidence of the credibility of the witnesses.

And as sincerely as I can possibly say it, I thank you for your service in this case. Thank you."

Following closing arguments and outside the presence of the jury, the trial court indicated concern that counsel's request that the jury be "consistent" was improper. After allowing the parties the opportunity to brief the issue, the court elected not to declare a mis-

trial, but instead, to give to the jury the following curative instruction:

> "With the verdict forms which you will receive for *** plaintiffs' Complaint, you will also receive interrogatories to be answered by you in the course of your deliberations. These interrogatories are specific questions relating to specific facts at issue in this case, and you will be required to deliberate as to each of these interrogatories and reach a unanimous verdict. In your deliberations as to these interrogatories, you are to follow the instructions which I have given you, and you are to determine the verdict to those interrogatories on the basis of the evidence, and the evidence alone, presented to you during trial."

Continental now argues that counsel's request that the jury answer its special interrogatories "consistent" with the verdict was *per se* reversible error, notwithstanding the trial court's special instruction. Continental relies principally upon *Sommese v. Maling Brothers, Inc.* (1966), 36 Ill. 2d 263, 222 N.E.2d 468.

In *Sommese*, the supreme court considered statements by counsel in which counsel explained "the significance and effect" of the special interrogatories submitted to them. (*Sommese*, 36 Ill. 2d at 266.) Counsel told the jury that the interrogatory had been "slipped in" by the defendant, that the jury's answer to the special interrogatory would supersede any verdict it might otherwise reach on the issues and that the jury should harmonize its answer to the interrogatory so as not to deprive the plaintiff of her recovery. (*Sommese*, 36 Ill. 2d at 266.) The court determined that counsel's arguments, which had not been objected to by opposing counsel, had the effect of improperly informing the jury of the source of the interrogatory and that counsel's comments defeated the purpose of the special interrogatory. (*Sommese*, 36 Ill. 2d at 266-67.) The supreme court reversed and remanded the case for a new trial.

We have carefully reviewed the court's decision in *Sommese* and considered the relevant cases from our own court: *Kosinski v. Inland Steel Co.* (1989), 192 Ill. App. 3d 1017, 549 N.E.2d 784 (attorney's comment that plaintiff could not recover unless jury answered "no" to special interrogatory was simply an appeal to the jury to follow evidence and was not error); *Levin v. Welsh Brothers Motor Service, Inc.* (1987), 164 Ill. App. 3d 640, 518 N.E.2d 205 (counsel may not argue legal effect of special interrogatory but may argue its logical effect *vis-a-vis* the general verdict—no error); *Burris v. Madison County* (1987), 154 Ill. App. 3d 1064, 507 N.E.2d 1267 (*dicta* cautioning attorneys that it is "reversible error" to tell jury that special interrogatories should be consistent with general verdict); *Massa v. G. Helmkamp Excavating & Trucking Co.* (1986), 145 Ill. App. 3d 60, 68,

495 N.E.2d 648 (counsel's comments, including the comment, " 'I can't stress enough you have to answer the Special Interrogatories yes,' " was reversible error); *Burns v. Howell Tractor & Equipment Co.* (1977), 45 Ill. App. 3d 838, 360 N.E.2d 377 (counsel stopped short of committing reversible error because he did not advise jury of source or significance of special interrogatory); *Sutton v. Peoples Gas Light & Coke Co.* (1970), 119 Ill. App. 2d 471, 474, 256 N.E.2d 19 (reversible error where court overruled objection to counsel's argument, " 'No matter what else you say, if you mark that "yes" she gets nothing' "); *Thomas v. Dalpos* (1975), 26 Ill. App. 3d 877, 326 N.E.2d 42 (reversible error where counsel asked jury to conform its interrogatory answers to the general verdict); *Mathes v. Basso* (1968), 104 Ill. App. 2d 237, 244 N.E.2d 362 (reversible error where judge advised jury to return verdict consistent with special interrogatories); *Swanson v. Chester Johnson Electric Co.* (1955), 5 Ill. App. 2d 175, 125 N.E.2d 304 (judge's instruction to jury that special interrogatory should be compatible with general verdict was error). After carefully reviewing these cases, we find no error here.

"The scope of closing argument is within the sound discretion of the trial court and the reviewing court will reverse only if the argument is prejudicial." (*Eaglin v. Cook County Hospital* (1992), 227 Ill. App. 3d 724, 732-33, 592 N.E.2d 205.) This case does not involve an instance in which the jury was advised that if the interrogatories were not answered in a certain way, a verdict for the plaintiff would be nullified. This is also not a case in which counsel engaged in extensive commentary on the subject, or one in which the jury was told that the defendants had been the source of the special interrogatories. Counsel's single innocuous comment was far less serious than the statements made to the jury in *any* of the above-cited cases. We conclude that, although counsel's comment was inadvisable, defendants suffered no prejudice therefrom. (See *Thorsen v. City of Chicago* (1979), 74 Ill. App. 3d 98, 392 N.E.2d 716.) This determination is made easier in light of the action of the trial court in giving its carefully worded curative instruction. See generally *People v. Baptist* (1979), 76 Ill. 2d 19, 30, 389 N.E.2d 1200.

■ Continental next argues that the trial court improperly denied one of its tendered jury instructions on damages and that the jury's award necessarily represents an impermissible double recovery. With regard to the jury instruction issue, the record demonstrates that plaintiffs had initially tendered an instruction that directed the jury to assess any damages "at the time [the land] would have been purchased." This instruction was consistent with *Bachewicz v. American National Bank & Trust Co.* (1984), 126 Ill. App. 3d 298, 308, 466 N.E.2d 1096. Defendants objected to this instruction, claiming that

the correct time to evaluate damages was "at the time of the breach." (See *Spangler v. Holthusen* (1978), 61 Ill. App. 3d 74, 83, 378 N.E.2d 304; *Foster Enterprises, Inc. v. Germania Federal Savings & Loan Association* (1981), 97 Ill. App. 3d 22, 31-32, 421 N.E.2d 1375.) Defendants argued that the breach occurred, if at all, on March 22, 1984.

The law with regard to jury instructions is well settled. The trial court has the discretion to determine which instruction shall be given, and the exercise of that discretion will not be disturbed on review unless it has been "clearly abused." (*Tuttle v. Fruehauf Division of Fruehauf Corp.* (1984), 122 Ill. App. 3d 835, 844, 462 N.E.2d 645; *Clarkson v. Wright* (1984), 121 Ill. App. 3d 230, 459 N.E.2d 305, *rev'd on other grounds & remanded* (1985), 108 Ill. 2d 129, 483 N.E.2d 268.) The standard for determining the adequacy of jury instructions is whether they were sufficiently clear to avoid misleading the jury, while at the same time, fairly and correctly stating the law. *Nolan v. Elliott* (1989), 179 Ill. App. 3d 1077, 1085, 535 N.E.2d 1053; *Black v. Peoria Marine Construction Co.* (1987), 160 Ill. App. 3d 357, 513 N.E.2d 622.

After reviewing the issue with the proper standard in mind, we find no error in the trial court's decision to modify the plaintiffs' instruction to include the words "at the time in question." This instruction permitted each of the parties to argue its respective views on the issue. We fail to see how Continental could have been prejudiced by the court's instruction in light of the fact that the jury appears to have based its award on an appraisal of the property that Continental itself tendered to the bankruptcy court on February 14, 1984, just five weeks prior to the date on which Continental claims the breach occurred.

■ Finally, we address Continental's claim that the jury's award provides a windfall recovery for the plaintiffs. The record shows that plaintiffs sought and received two distinct measures of damages: (1) $4.5 million, representing the difference between the fair market value of land upon which the Loop Hospital had been built ($9.5 million) and the purchase price plaintiffs had agreed to spend in acquiring the land ($5 million); and (2) $1.6 million, representing the value of the CON the plaintiffs would have received had they been able to go forward with construction of the Silvetti Clinic. As we have noted, the first measure of damages was based upon an appraisal tendered to the bankruptcy court by Continental on February 14, 1984. The appraisers in this estimate determined that the "highest and best use" of the property would be to tear down the existing building and use the land as part of a larger office complex. Continental claims

that the jury's decision to award plaintiffs both the lost value of the land and the value of the CON creates an impermissible double recovery. We agree.

The standard measure of damages in a purchaser's action for breach of a contract to convey land is the difference between the fair market value of the property and the contract price. The purpose of damages is to put the nonbreaching party into the position he would have been in had the contract been performed (*Kemp v. Gannett* (1977), 50 Ill. App. 3d 429, 365 N.E.2d 1112), but not in a better position (*Litwin v. Timbercrest Estates, Inc.* (1976), 37 Ill. App. 3d 956, 347 N.E.2d 378). It is well settled that the compensation awarded in a breach of contract action should not provide plaintiff with a windfall recovery. *Kalal v. Goldblatt Brothers, Inc.* (1977), 53 Ill. App. 3d 109, 368 N.E.2d 671.

The jury's award of both the lost market value of the land and the value of the CON is factually inconsistent. The CON has no market value as it is neither transferrable nor assignable. (See 210 ILCS 85/6 (West 1994).) Therefore, the CON represents an asset only in that it may be used by the plaintiffs in connection with their operation of a clinic on the Loop Hospital site. If the plaintiffs had purchased the land from the defendants and paid $5 million, later determining that the land should be sold as an office complex and not used as a hospital, the CON would have no value. Plaintiffs cannot recover upon the theory that they would have sold the land and also on the theory that they would have retained the land to run a hospital.

Plaintiffs recognize the inherent inconsistency in their theory of damages but attempt to justify receiving the jury's total award by raising the possibility that they might have built a mixed-use facility, sold the property to a developer, and then leased back those parts of the complex necessary for their clinic. One of their experts testified that this would be a possible use for the land. Plaintiffs' argument overlooks the fact that the $9.5 million appraisal on the property necessarily assumed that *all of the property* would be put to its "highest and best use" as an office facility. Taking a substantial part of the facility and using it as a hospital would, necessarily, reduce the overall value a buyer seeking to maximize his profit would pay for the complex, unless, of course, plaintiffs were willing to enter into a lease as tenants for the new hospital at premium rates. The record presents no factual scenario under which the plaintiffs could sell the land for $9.5 million and still retain use of a significant portion of it for use as a hospital without incurring substantial costs, costs which the plaintiffs' sell-lease-back calculation conveniently overlooks.

The jury's award of damages for the value of the CON is also legally inconsistent with the jury's award for the lost value of the land. Because the CON cannot be sold on the market, plaintiffs' expert was forced to evaluate it by discounting the future profits that could reasonably be associated with its ownership. The problem with this method of evaluating the CON in this case is that any future profits associated with owning the CON have already been incorporated into the jury's $4.5 million award for the lost value of the land. This is because part of what the market evaluates when it sets a price for property is the property's future profit potential. (See generally 1 D. Dobbs, Law of Remedies § 3.3(7), at 312-13 (2d ed. 1993).) When the appraisal upon which the plaintiffs relied indicated that the market value of the land was $9.5 million if put to its "highest and best use," this estimate necessarily included the possibility that the facility would be used as a hospital in connection with the ownership of a valid CON. Awarding the plaintiffs both the value of the CON and the lost market value of the property therefore results in an impermissible double recovery. In order to avoid this result, the jury's award of damages must be reduced by $1.6 million.

In light of our disposition of the above issues, the issues raised in plaintiffs' cross-appeal need not be addressed.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed, as modified.

Affirmed as modified.

EGAN and RAKOWSKI, JJ., concur.