ROBERT JONES, d/b/a Advance Steel Company, and B-K Partners, Plaintiff-Appellee, v. MELROSE PARK NATIONAL BANK, as Trustee, *et al.*, Defendants-Appellants.

First District (6th Division)   No. 1—91—0205

Opinion filed April 10, 1992.

Robert S. Fritzshall, of Fritzshall & Gleason, of Chicago, for appellants.

Melanie Grabavoy, of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Robert Jones, doing business as Advance Steel Company and B-K Partners, brought suit alleging breach of a real estate contract against defendants Melrose Park National Bank, as trustee, and Earl M. Greene, as beneficiary (collectively defendant). Defendant filed a counterclaim against plaintiff seeking damages for past-due rental payments, utilities and damage to the property. Following a bench trial, the trial judge found defendant in breach of the agreement and awarded plaintiff reimbursement of earnest money, improvements to the real and personal property, and moving expenses. The trial court also granted defendant's counterclaim against plaintiff for past-due rent payments and utilities.

Defendant appeals, contending that the trial court erred in concluding that defendant breached the real estate sales contract by failing to provide merchantable title, and that plaintiff should not have been awarded consequential damages. (Defendant does not contest the trial court's judgment ordering the return of plaintiff's earnest money. Additionally, the past-due rent payments and utilities awarded to defendant pursuant to the counterclaim are not at issue in this appeal.)

We adduce the following relevant facts from the record. On November 28, 1984, the parties entered into a written agreement whereby plaintiff, who operated a structural steel fabricating company, agreed to pay $265,000 for certain real estate and industrial property owned by defendant at 2755 West Lake Street, Melrose Park, Illinois. Paragraph 8 of the real estate sales contract provided in relevant part:

"Seller warrants that Seller, its beneficiaries or agents of Seller *** have received no notices from any city, village or other governmental authority of zoning, building, fire or health code violations in respect to the real estate that have not been heretofore corrected."

On September 17, 1984, the United States Environmental Protection Agency (EPA) filed a complaint and notice of opportunity for hearing against defendant for failure to fully comply with regulations regarding the disposal of polychlorinated biphenyls (PCB) in a 490-square-foot area located on defendant's property.

Plaintiff testified that he met with defendant Greene and a real estate agent in October 1984 and held several discussions concerning the purchase price and occupancy of the property. Plaintiff did not observe dirt being moved or any construction on the premises prior to the time he signed the contract. Defendant did not mention that he had been contacted by the EPA, or that a soil contamination problem existed. There was no agreement to pay any rent at the time plaintiff began occupying a portion of the premises because both parties expected to proceed to closing the sale shortly.

Plaintiff testified that he first discovered soil contamination on the premises in May 1985 after moving into the property. Defendant informed plaintiff that there were transformers on the property leaking PCB and that the EPA was giving him a hard time. Defendant contracted with an environmental company to perform the clean-up operation, which began in June 1985. The transformer and the capacitors were removed from the premises in September 1985. After that time, defendant repeatedly stated that the resolution of the problem was "imminent."

Karl Irwinski, plaintiff's partner, similarly testified that he first became aware of the soil contamination problem during the first week of May 1985. Irwinski noticed defendant's employees filling 55-gallon drums with dirt. According to Irwinski, defendant denied that any problem existed; however, Sue Semenec, defendant's office manager, informed Irwinski the following day that a transformer on the property was leaking PCB.

In his evidence deposition, defendant Greene stated that he first became aware of the PCB problem in July or August 1984, when the EPA told him that a transformer on the property was leaking. Semenec also testified that in July 1984 the EPA visited the premises and made some general inquiries; however, defendant did not receive any civil complaints until December 1984. Semenec stated that defendant first learned of the specific EPA violation at the end of February or early March 1985, and that defendant advised plaintiff of the soil contamination problem at that time.

The agreement provided that defendant could use all of the warehouse building space for a period of six months after the closing, but that 10,000 square feet of warehouse space would be available to plaintiff prior to closing. Within 90 days of the sale, the parties agreed that defendant would provide plaintiff with one-half of the remaining warehouse space, and the remainder within six months after closing. Defendant also had the option to retain possession of the last 7,500 square feet for 90 days. There was no charge to defendant for the use of this space for nine months after the date of closing.

The sales contract contained a mortgage contingency which provided that purchaser would secure a firm commitment for a conventional loan in the amount of $173,500. In paragraph 5 of the supplemental amendment, plaintiff was also given access to the premises to make any and all necessary improvements, as set forth below:

"[B]eginning January 1, 1985, buyer will have access to the entire premises to make any and all necessary improvements. *** In the event the sale is not closed due to Buyer's failure to obtain a mortgage or for any other reason due to Buyer's fault, Buyer will not be entitled to reimbursement for the reasonable value of the expenditures made to said premises.

In the event the sale is not closed due to Seller's fault, Seller will reimburse Buyer for all expenditures made by Buyer in improving said premises after Buyer receives his mortgage commitment; any expenditures made by Buyer prior to the time he receives his mortgage commitment will not be reimbursed

regardless of whether the sale is closed due to Seller's fault or Buyer's fault."

Plaintiff received a mortgage commitment from Colonial National Bank on January 18, 1985, in the amount of $200,000 which expired on February 6, 1985. Subsequently, on February 9, 1985, plaintiff received a second commitment from Colonial Bank which extended through February 25, 1985. The original closing date of December 14, 1984, was rescheduled to February 1, 1985, and later to March 8, 1985, pursuant to a contractual rider.

On February 27, 1985, plaintiff obtained a mortgage commitment from Melrose Park National Bank for $200,000, which expired on April 26, 1985. Melrose Park Bank issued another mortgage commitment on November 29, 1985, which extended through January 28, 1986. In that mortgage commitment, a provision was included that the $200,000 loan was contingent upon satisfactory evidence of a complete release from any further action by the EPA due to the PCB problem.

James Addington, vice-president of the loan department of Melrose Park Bank, testified that he had a series of discussions with defendant beginning in late May or early June 1984, wherein defendant told him that his son had installed a transformer on the property which presented some ground contamination problems. After the property had been sold to plaintiff, defendant informed Addington that he had contracted with an engineering firm for removal of the transformer and that soil borings were going to be performed in spring 1985 to determine if there was any PCB leakage. At the time, it was the usual and customary practice of the banking industry to demand that the property be cleaned up prior to the time that the closing would take place so that the bank did not acquire a piece of collateral it would not be able to use. Addington never received clearance from the EPA that the contaminated soil had been removed. Aside from the EPA violation, there was no other reason why Addington did not disburse the mortgage loan to defendant.

In June 1985, the parties entered into an oral lease agreement, retroactive to April 1985, which provided that plaintiff would occupy 10,000 square feet of warehouse space, 5,000 square feet of yard space, and 1,500 square feet of office space. (Prior to that time, plaintiff had access to 6,000 square feet of warehouse space only.) Plaintiff rented the premises on a month-to-month basis at a rental rate of $3,000 per month plus utilities. Plaintiff paid only the first month's rent and a certain portion of the utilities.

Plaintiff made numerous improvements to the property, including the installation of electrical lines, gas piping, infrared heating, masonry,

and the replacement of approximately 800 to 900 windows in the warehouse facility. Plaintiff stated that in August 1985, defendant allowed him to proceed with the extensive improvements required in the property in lieu of paying rent. From May 1985 through June 1986, plaintiff inquired approximately two or three times a month if the EPA releases were forthcoming and about the progress of the soil testing.

On May 19, 1986, defendant sent plaintiff a five-day notice to vacate the premises. Plaintiff inquired whether defendant would agree to a long-term lease with an option to buy if defendant could produce an EPA release at some later time. Defendant refused plaintiff's request and stated that he wanted to sell the building and proceed with the original deal.

The parties agreed that plaintiff had to pay the rent or move. Plaintiff testified that he moved out of the premises in June 1986 because defendant did not deliver the EPA release as promised; never provided the amount of space required by plaintiff's business; demanded full payment of the rent, and would not acknowledge the improvements made by plaintiff as an offset against rent owed. Irwinski testified that he wanted a long-term lease because plaintiff wanted defendant to vacate the property and lease the entire facility to plaintiff. (The EPA did not issue its final consent decree approving the removal of the contaminated soil until January 1987.)

The trial court ordered the return of plaintiff's earnest money in the amount of $26,500 and awarded consequential damages in the amount of $115,445.11, which included $45,548.64 as moving expenses, $67,896.47 for improvements made to the property, and $2,000 as a mortgage commitment fee. The trial court did not allow plaintiff recovery for lost profits. With respect to the counterclaim, the trial judge found that plaintiff owed defendant $40,742 for past-due rent and utilities pursuant to the counterclaim, and ordered that amount as a setoff against the sum defendant owed to plaintiff.

On appeal, defendant first asserts that plaintiff waived the provisions of paragraph 8, which warrants that defendant had no notice from any governmental authority of any health code violation, because he failed to rescind the contract upon first learning of the alleged breach. In essence, defendant argues that as soon as the buyer learned of the contaminants and alleged misrepresentations, he should have rescinded the contract and not relied upon the seller's promises to clean up the contaminants.

As support, defendant relies upon *Madison Associates v. Bass* (1987), 158 Ill. App. 3d 526, 511 N.E.2d 690, for the proposition that as soon as an individual learns of fraud, he is required to disaffirm or aban-

don the transaction with all reasonable diligence and, if he acts as though the transaction is still binding, he waives all benefits or relief from the misrepresentations. (See also *Eisenberg v. Goldstein* (1963), 29 Ill. 2d 617, 195 N.E.2d 184.) In *Madison Associates*, a tenant entered into a rental agreement for commercial office space and later withheld rent payments because of roof leakage and heating problems. After extensive negotiations, the parties entered into a settlement agreement for the back rent, which also released the landlord from any claims or losses incurred as a result of water infiltration. Tenant later filed a counterclaim seeking damages for water infiltration that occurred after the agreement was signed.

This court held that the tenant waived any claim that the landlord fraudulently induced him to sign the agreement because he was aware of the alleged fraud within four weeks after signing the agreement. Nevertheless, the tenant retained possession of the premises, made payments of back rents, and did not allege fraudulent inducement until the counterclaim was filed after the case was on trial.

However, the present case is distinguishable from *Madison Associates* because defendant was aware that a soil contamination problem existed in July or August 1984 when the EPA informed him that a transformer on the property was leaking. The EPA consent agreement indicates that a complaint and notice of opportunity for hearing was filed on September 17, 1984, alleging that defendant failed to comply with regulations regarding the disposal of PCB. Nonetheless, defendant entered the contract a few months later and represented that he had received no notices from any governmental authority of any health code violation that had not been corrected.

Semenec testified that she informed plaintiff of the existence of the soil contamination problem in February 1985 upon learning of the specific violation; however, plaintiff and Irwinski both testified that they did not learn of the problem until May 1985, after moving into the premises. Addington also testified that in May or June 1984, defendant informed him that ground contamination problems existed on the property.

More importantly, plaintiff asked Greene two or three times a month from May 1985 through June 1986 about the status of the EPA releases and soil testing. The record indicates that defendant gave continual assurances to plaintiff and Irwinski that the EPA release was "imminent," and that the soil contamination problem would soon be cured. Indeed, the parties did not enter into a rental agreement prior to moving into the premises because both parties expected to close the transaction shortly. As such, we cannot fault plaintiff for relying upon defendant's promise that the soil contamination problem would be corrected

and not abandoning the property. As indicated by the record, plaintiff had already expended considerable sums of money in improvements to the premises.

■■ Waiver is the purposeful relinquishment of a known right and can arise either expressly or by conduct inconsistent with intent to enforce a right. (*Bailey v. Petroff* (1988), 170 Ill. App. 3d 791, 525 N.E.2d 278.) To establish an implied waiver, there must be a clear, unequivocal, and decisive act of a party showing such a purpose. (*Washburn v. Union National Bank & Trust Co.* (1986), 151 Ill. App. 3d 21, 502 N.E.2d 739.) In light of plaintiff's continual inquiries about the status of the EPA releases from the time he first became aware of the soil contamination problem, we find no evidence that plaintiff intended to waive seller's express warranty set forth in paragraph 8 that no health code violations existed.

■■ Alternatively, defendant argues that plaintiff ratified the agreement by remaining on the premises for approximately 18 months after learning of the existence of contamination on the property. We find defendant's argument to be without merit because in order for a sale of land to be valid, it must comply with the Statute of Frauds. (Ill. Rev. Stat. 1983, ch. 59, par. 2.) The law is clear that " 'the same formality is required for ratification as for original authorization.' " (*George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.* (1973), 12 Ill. App. 3d 362, 365, 299 N.E.2d 601, quoting F. Mechem, *Law of Agency* §205 (4th Ed. 1952).) Thus, where a writing is expressly required by the Statute of Frauds, a writing is also essential to effect a valid ratification. *Mueller & Sons*, 12 Ill. App. 3d 362, 299 N.E.2d 601.

Defendant next contends that plaintiff's discovery of an encroachment and judgment upon the land, back taxes, and the presence of hazardous waste materials does not constitute a failure by seller to provide merchantable title. Merchantable title is characterized as:

> " '[A] title not subject to such reasonable doubt as would create a just apprehension of its validity in the mind of a reasonable, prudent and intelligent person; one that persons of reasonable prudence and intelligence, guided by competent legal advice, would be willing to take and pay the fair value of the land for.' " *Sinks v. Karleskint* (1985), 130 Ill. App. 3d 527, 529, 474 N.E.2d 767, quoting *Wilfong v. W.A. Schickedanz Agency, Inc.* (1980), 85 Ill. App. 3d 333, 337, 406 N.E.2d 828, 831.

It is further defined as "not perfect title, but rather title reasonably secure against litigation or flaws decreasing market value." (*Stevens v. Wilson* (1980), 86 Ill. App. 3d 1047, 1053, 408 N.E.2d 496.) Merchantability of real estate can and must be decided by the court as a matter of

law when sufficient evidence concerning surrounding facts is determinable from the record. *Sinks v. Karleskint*, 130 Ill. App. 3d 527, 474 N.E.2d 767.

■ Applying these principles to the present case, we find that in paragraph 8, defendant specifically warranted that he received no notice from any governmental authority of any health code violations that had not been corrected; however, it is undisputed that the EPA contacted defendant several months prior to the sale of the property to discuss defendant's failure to comply with regulations regarding the disposal of the PCB. The record also indicates that defendant expended $100,000 in excavation and removal of contaminated soil, and that the proposed EPA penalty was in the amount of $28,500. In view of the fact that plaintiff contracted to purchase the property at $265,000, it is reasonable to infer that the presence of the soil contamination upon the premises, in conjunction with the imposition of severe EPA sanctions, had a profound impact upon the merchantability of the title. Accordingly, we find that the presence of hazardous waste materials, in itself, is sufficient to preclude defendant from tendering merchantable title to plaintiff. As such, we need not reach the merits of whether the encroachment, judgment and back tax issues posed potential merchantability of title problems.

■ Defendant also argues that he was not required to tender merchantable title prior to tender of performance by plaintiff. Essentially, defendant contends that his only obligation was to provide a title commitment five days before closing. Consequently, because a closing date was never set, defendant was not required to tender merchantable title.

Review of the facts in this case reveals that plaintiff procured four mortgage commitments. Colonial Bank and Melrose Park Bank each issued two commitments in excess of the contract requirement for purchase of the property. Melrose Park Bank's second commitment extended through January 28, 1986, and was conditioned upon a release from any further action by the EPA due to the soil contamination problem. Addington testified that aside from the EPA violation, there was no other reason why the mortgage loan was not disbursed to defendant. Thus, it appears that plaintiff was able to tender performance once the soil contamination problem was solved.

In *Christopher v. West* (1951), 409 Ill. 131, 98 N.E.2d 722, our supreme court held that if any claimed defect affected the merchantability of the title and was not cured or curable within a reasonable time as provided in the contract, no tender of the purchase price was necessary. In this case, the parties entered into the agreement on November 28, 1984, and the EPA final release was not issued until January 1987. Dur-

ing that time, two closing dates were set and postponed. The record also demonstrates that plaintiff continually queried defendant about the progress of the soil contamination removal. We find, therefore, that plaintiff's failure to set a closing date, in light of his awareness that the EPA release was not forthcoming, is of no effect.

■ Defendant further argues that plaintiff cannot recover for repairs made to enhance his leasehold interest. Defendant cites *Johnston v. Suckow* (1977), 55 Ill. App. 3d 277, 370 N.E.2d 650, for the proposition that a landlord is generally not liable to a tenant for the value of improvements voluntarily made by tenant in the absence of an agreement imposing such liability. However, paragraph 5 of the supplemental amendment here specifically provides:

> "In the event the sale is not closed due to Seller's fault, Seller will reimburse Buyer for all expenditures made by Buyer in improving said premises after Buyer receives his mortgage commitment."

As previously discussed, plaintiff received mortgage commitments from two banks. The improvements at issue were made after the commitments were procured. While it is true that a mortgage commitment was not continuously in effect, we note that Addington testified the mortgage proceeds would have been released upon clearance from the EPA of the soil contamination problem. Thus, we find that the trial court properly concluded that paragraph 5 requires defendant to reimburse buyer for improvements made to the premises.

■ We turn now to the issue of whether plaintiff is entitled to consequential damages for moving expenses. It is well established that a person breaching a contract can be held liable for such damages as may fairly and reasonably be considered as naturally arising from the breach thereof, in light of the facts known or which should have been known, or such as may reasonably be supposed to have been within the contemplation of the parties as a probable result of a breach thereof. (*Case Prestressing Corp. v. Chicago College of Osteopathic Medicine* (1983), 118 Ill. App. 3d 782, 455 N.E.2d 811, citing *Sheppard v. Fagan* (1981), 94 Ill. App. 3d 290, 418 N.E.2d 876; *Carlson v. Collander* (1970), 126 Ill. App. 2d 236, 261 N.E.2d 817; 15 Ill. L. & Prac. *Damages* §33 (1968).) Speculative damages or damages not the proximate result of a breach of contract will not be allowed. *Feldstein v. Guinan* (1986), 148 Ill. App. 3d 610, 499 N.E.2d 535.

We hold that plaintiff was not entitled to consequential damages for the expense of moving. After it became apparent that the soil contamination problem prevented the parties from closing the transaction, the parties entered into an oral lease which provided that plaintiff would

lease a portion of the premises at a rental rate of $3,000 per month plus utilities. Although the lease extended from April 1985 through June 1986, plaintiff paid only the first month's rent, and some utilities. Thus, plaintiff accumulated approximately $40,000 in arrears for past-due rent and utilities. Plaintiff insisted that defendant enter into a long-term lease, which defendant refused to consider. At that point, the parties agreed that plaintiff had to either pay the past-due rent or move from the premises.

According to plaintiff, he moved from the premises because defendant did not deliver the EPA release. Also, plaintiff complained that defendant did not provide sufficient space for plaintiff's business; demanded full payment of the rent, and would not acknowledge the improvements made by plaintiff as an offset against rent owed. Irwinski stated that he wanted a long-term lease because plaintiff wanted defendant to move out of the property and lease the entire facility to plaintiff. The real estate sales agreement, however, provided defendant with access to varying amounts of commercial space on the premises at no charge for approximately nine months after closing.

We do not believe that plaintiff's expenses in moving from the facility should be awarded as consequential damages, for plaintiff chose to move from the facility rather than pay the past-due rent. Such an action was not within the contemplation of the parties at the time the parties entered into the agreement. Accordingly, we reverse that portion of the judgment ordering defendant to pay plaintiff's moving expenses in the amount of $45,548.64.

For the foregoing reasons, the order of the circuit court of Cook County finding that defendant breached the real estate agreement by failing to deliver merchantable title is affirmed. That portion of the judgment awarding to plaintiff consequential damages in the amount of $69,896.47 is affirmed, and the award of $45,548.64 for moving expenses is reversed.

Judgment affirmed in part, reversed in part.

LaPORTA and RAKOWSKI, JJ., concur.