Marc D. **HUMPHRIES** and Kelle R. **Humphries**, Appellants– Defendants,

v.

Max D. **ABLES** and Betty A. **Ables**, Appellees–Plaintiffs.

No. 48A05–0206–CV–278.

Court of Appeals of Indiana.

June 16, 2003.

---

Patrick R. Ragains, Smith & Ragains, Anderson, IN, Attorney for Appellants.

David W. Stone IV, Stone Law Office Anderson, IN, Attorney for Appellees.

## OPINION

SULLIVAN, Judge.

Max and Betty Ables (the "Sellers") are the owners of Frankton Liquor in Frankton, Indiana. Prior to its use as a liquor store, the property had been the site of a gasoline station. When the station closed in 1964, the underground storage tanks were filled with water to keep them from rising out of the ground due to freezing and thawing of the soil. The tanks have not been removed from the property and are under a portion of the parking lot.

On January 9, 1998, Marc and Kelle Humphries (the "Buyers") entered into a real estate contract[1] wherein they agreed to purchase Frankton Liquor from the Sellers. According to the terms of the contract, the Buyers agreed to pay to the Sellers the sum of $59,000 plus the wholesale value of the inventory of the store as calculated on January 11.[2] A down payment of $10,000 was due on January 16 in addition to the payment for the value of the inventory. The Buyers also agreed to

---

1. A review of the exhibits and the appellant's appendix indicates that page four of the contract was not presented to the trial court or to this court for our review. From reading the surrounding pages, it appears that the missing page included information on some of the payment terms of the contract and the responsibilities of the parties regarding insuring the premises. It does not appear that it is necessary that the missing information be before this court in order to fully and adequately address the issues as presented by the parties.

2. At trial and upon appeal, the Buyers assert that the contract did not contain the entire agreement between the parties and that oral modifications were made to the contract. This argument seems to have been made in order to bolster the Buyers' claim that the Sellers committed fraud in selling the property to the Buyers. The main issue upon which the Buyers rely is their assertion that the contract stated that the property was being sold with the inventory of the store included, but that the Sellers required them to conduct an inventory of the goods in the store and to pay for them separately. However the Buyers may have arrived at the belief that the inventory was to be included as part of the sale of the store and that no additional money was due for the inventory, we disagree with that assertion. The contract clearly states on page

pay eight percent interest upon the principal due.

In January of 2000, the Buyers sent a letter to the Sellers informing them that they could no longer commit the necessary resources to the liquor store and requesting the Sellers' permission to assign the existing contract to a third party.[3] The Sellers gave them permission to transfer the store to a third party, provided that the new purchaser was reputable. The Sellers also reserved the right of approval of the new purchaser. On April 28, 2000, the Sellers received a letter stating that an offer had been made for the liquor store but that a test for soil contamination needed to be performed. If the test results indicated that the property was contaminated, the offer would be withdrawn. The Sellers never had a test conducted on the property and the Buyers vacated the premises on July 1, 2000. At that time, they returned the keys to the Sellers.

On July 13, 2000, the Sellers filed suit in Madison Superior Court seeking damages for the Buyers' breach of the contract. The Buyers filed a counter-suit claiming that the Sellers breached the contract and that they represented that the tanks would not interfere with the operation of the business or the sale of the building. The Buyers claim that these representations were fraudulent and caused them damages. On November 21, 2001, a hearing was held before a master commissioner. On April 18, 2002, the trial court found in favor of the Sellers and ordered specific performance of the contract. Additionally,

the Buyers were ordered to reimburse the Sellers for real estate taxes and insurance fees that were paid after the Buyers relinquished the property. Finally, the Buyers were ordered to pay $3,500 in attorney fees to the Sellers. The total amount the Buyers were ordered to pay equaled $53,433.24.

Upon appeal, the Buyers challenge the order by asserting that the contract was entered into based upon the fraudulent representations of the Sellers and that they could not receive marketable title to the property because of the presence of the tanks and possible soil contamination. They request that the order of the trial court be reversed and the cause remanded to the trial court for a determination of damages in their favor. Additionally, they assert that if the trial court's decision in favor of the Sellers is proper, specific performance was not the proper remedy. The Sellers counter by stating that they had no duty to disclose the presence of the tanks, soil contamination would not render the title unmarketable, and specific performance was proper. They also request that they be awarded appellate attorney fees and that the cause be remanded for a calculation of those fees.

We affirm and remand for further proceedings.

 We begin by noting that the trial court entered special findings of fact and conclusions of law. It does not appear from the record or the briefs that a written request was filed by either party prior

---

three that the purchase price of the business was to be the base price of $59,000 "plus the wholesale value of the inventory. The cost of the inventory shall be calculated during an inventory thereof to be completed on Sunday, January 11, 1998, and payment in full shall be made to Sellers on January 16, 1998." Exhibits at 3.

**3.** While the Buyers requested the ability to assign the contract, it appears that they were willing to transfer the liquor store under terms and conditions different than that of the contract entered into by them and the Sellers, and that the Sellers agreed with such changes. Consequently, we refer to the transaction as a transfer rather than a sale or an assignment.

to the admission of evidence in accordance with Trial Rule 52;[4] therefore, we review the special findings and conclusions as if they were issued sua sponte by the trial court. *See Carroll v. J.J.B. Hilliard, W.L. Lyons, Inc.*, 738 N.E.2d 1069, 1075 (Ind. Ct.App.2000) (stating that when a request for specific findings is made orally, we treat the findings as if they were entered sua sponte), *trans. denied.* When a court has made special findings, we employ a two step standard of review. *Missi v. CCC Custom Kitchens, Inc.*, 731 N.E.2d 1037, 1039 (Ind.Ct.App.2000). We first determine whether the evidence supports the findings and then whether the findings support the judgment. *Smith v. Brown*, 778 N.E.2d 490, 494 (Ind.Ct.App.2002). We consider only the evidence most favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id.* We do not reweigh the evidence or assess the credibility of the witnesses. *Id.* When the trial court enters findings sua sponte, the specific findings control only as to the issues they cover. *Id.* at 495. A general judgment standard applies to any issue upon which the trial court has not made a finding. *Id.* A general judgment may be affirmed upon any legal theory supported by the evidence. *Id.*[5]

Turning now to the issues before us, we must first address what is being challenged in this case. The Sellers claim that they had no duty to disclose the presence of the tanks because they were taken out of use at a time prior to which their use would have made mandatory the reporting of their presence.[6] The Buyers, on the other hand, argue that the lack of a duty to report the presence of the tanks is irrelevant. We agree with the Buyers' contention.

In this decision, we make no representations regarding whether the Sellers had a duty to disclose any information concerning the presence of the underground storage tanks or potential soil contamination because the posture of this case is one of fraud. Certain representations were made by the Sellers, and therefore, whether they had a duty to disclose the presence of the tanks is irrelevant. We review only what was stated by the Sellers to determine whether they misrepresented the potential effects of the presence of the tanks. We do not address any legal ramifications arising from the potential responsibility of the parties should the site be contaminated.

# I

## *Fraud*

■ The elements of fraud are: (1) a material misrepresentation of past or existing facts by the party to be charged, (2) which was false, (3) was made with knowledge or reckless ignorance to falsity, (4) was relied upon by the complaining party, and (5) proximately caused the complaining party injury. *Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind.1996).

■ The Buyers claim that the Sellers made misrepresentations regarding the underground storage tanks by stating that Sellers had a duty to disclose the presence of the tanks. Therefore, we review this case as if we were reviewing a general judgment.

---

4. The Sellers assert in their brief that they made an oral request for findings after the presentation of evidence had begun.

5. The findings and legal conclusions of the trial court focused upon whether the Sellers had a duty to disclose the presence of the underground storage tanks to the Buyers. For reasons which will become clear in our discussion, we do not address whether the

6. To support their contention, the Sellers cite to the Responsible Property Transfer Law, Ind.Code 13–25–3 (Burns Code Ed. Repl. 2000).

their presence had no bearing upon the transfer of the property. As interpreted by the Buyers, this statement also means that there is no contamination upon the property.

The statement made by Betty Ables in response to Marc Humphries' question regarding the status of the tanks, as relayed by Kelle Humphries at trial, was "[o]h, don't worry about it. There's no problem. All of that's been taken care of." Transcript at 62. At trial, Betty testified that she did not remember having a discussion with the Buyers about the tanks, but that in the past, whenever anyone inquired about the property having been a gas station, she would tell them that the rule for disclosure did not apply because the tanks were not in use after January 1, 1974.

Turning to the elements of fraud which the Buyers were required to prove, we begin by noting that the Buyers have not proved that the representation made by Betty was a misrepresentation. Reviewing the statement attributed to Betty, she stated that there was not a problem caused by the presence of the underground storage tanks, but she made no representation regarding whether there may have been contamination upon the property. At trial, Kelle agreed that the presence of the tanks was not an issue, but that contamination was an issue. However, no representations were made regarding any contamination because as Betty testified and the trial court found, whenever anyone inquired about the tanks, Betty told them that the law did not require disclosure of the tanks because they were not used after 1974. This statement should not be construed as a representation that there was no contamination.

Additionally, the Buyers have not shown that Betty's representations were false.[7] There has been no evidence presented which would indicate that there is soil contamination caused by the underground storage tanks leaking at any point in time. As an element of fraud, it must be shown that the statements were false, not just that they may have been false. In fact, the Buyers' own demand that the Sellers have a Phase I environmental inspection performed belies any assertion that soil or groundwater contamination is present. Rather, it reveals that it is not known whether there is any contamination. This leads us to what we labeled as the fifth element of fraud, whether the representation caused an injury to the Buyers.

Assuming that a representation was made regarding the presence of contamination, without a showing that there was some sort of environmental contamination which prevents the property from being sold or places liability for cleanup upon the Buyers, the Buyers have not been injured. Because one would-be purchaser could not receive a loan until a clean Phase I inspection was assured, it does not follow that the property could not be sold or that its value had decreased to the point where the Buyers suffered.

Returning to the elements of fraud, the final element we address is whether the representation made by Betty was done with knowledge or reckless ignorance of the falsity. The Buyers have pointed to no evidence that the Sellers had knowledge at the time of the representation that there was contamination on the property, and more importantly, that the property was indeed contaminated. Further, while a possibility exists that there may be contamination based upon the pro-

---

7. Our discussion from this point forward assumes that Betty made some representation regarding contamination, but as previously stated, we do not interpret Betty's communication to have addressed the issue of soil contamination.

longed presence of the tanks, such a possibility does not equate Betty's statement to having been made with reckless ignorance.

Based upon these considerations, the Buyers have failed to establish that there was fraud committed by Betty which caused the Buyers to enter into the contract for the purchase of the liquor store.

## II

### Marketable Title

■■ The second part of the Buyers' assertion regarding the transfer of the property is that they could not receive merchantable title as guaranteed by the contract unless a Phase I environmental inspection was done which revealed no contamination. The term "merchantable title" is often used synonymously with the term "marketable title." [8] *Salmon v. Perez,* 545 N.E.2d 21, 25 (Ind.Ct.App.1989). "[T]itle 'which has no defects of a serious nature, and none which affect the possessory title of the owner, ought to be adjudged marketable.'" *Staley v. Stephens,* 404 N.E.2d 633, 635 (Ind.Ct.App.1980) (quoting *Kenefick v. Shumaker,* 64 Ind. App. 552, 565, 116 N.E. 319, 323 (1917)), *trans. denied.* One who contracts for the purchase of real property is not bound to accept a doubtful title, or one that would likely be involved in litigation, even though it may ultimately be adjudged to be good. *Staley,* 404 N.E.2d at 635.

We are aware of no Indiana case which has addressed whether marketable title may be transferred when there is the possibility that contamination from pollutants is present upon the real property to be transferred. However, this issue has been addressed by several other state courts and by several federal circuit courts of appeal.

The Seventh Circuit Court of Appeals, in reviewing a contract and fact situation similar to that here, noted the lack of Indiana law addressing whether the presence of hazardous wastes on property precluded a seller from conveying marketable title. *HM Holdings, Inc. v. Rankin,* 70 F.3d 933 (7th Cir.1995). As stated by the Seventh Circuit, the buyer wanted to create a non-disclaimable, implied-in-law warranty against hazardous waste contamination for purchasers of used industrial property. The Court determined that such law did not exist and that it was unlikely that such an implied-in-law warranty would be accepted in Indiana. *Id.* at 937.

In *McManus v. Rosewood Realty Trust,* 143 N.H. 78, 719 A.2d 600 (1998), the New Hampshire Supreme Court also faced the issue of whether the presence of contamination affected marketable title. In determining that the presence of contamination did not affect marketable title, the Court explained the distinction between the condition of title to the property and the condition of the property itself. As stated by the Court, "[t]here is a difference between economic lack of marketability, which relates to physical conditions affecting the use of property, [and] title marketability, which relates to defects affecting legally recognized rights and incidents of ownership. One can hold perfect title to land that is valueless; one can have marketable title to land while the land itself is unmarketable." *Id.* at 601. In reaching its decision, the Court also recognized several authorities which supported the contention that the presence of contamination did not affect marketable title, including *HM Holdings, Inc.* and *United States v.*

---

**8.** The contract states that the Buyers were to receive "warranties of good title." Appendix at 15. In their brief, the Buyers refer to "merchantable title." Throughout this opinion, we refer to it as "marketable title."

*Allied Chemical Corp.,* 587 F.Supp. 1205, 1206 (N.D.Cal.1984), in which the District Court held that the term "encumbrance" was not to be interpreted so broadly so as to include the presence of hazardous substances on real property.

Nevertheless, our research has revealed that not all jurisdictions are in agreement that the presence of contamination does not affect marketable title. In *Jones v. Melrose Park Nat. Bank,* 228 Ill.App.3d 249, 170 Ill.Dec. 126, 592 N.E.2d 562, 567 (1992), the Illinois Appellate Court noted that marketable title was defined as " 'not perfect title, but rather title reasonably secure against litigation or flaws decreasing market value.' " The Court then determined that the presence of hazardous waste precluded the seller from tendering marketable title. *Id.* at 568. That said, we note that the facts present in *Jones* are much different than those here.

In *Jones,* the seller was aware that issues of contamination existed because he had been contacted by the Environmental Protection Agency several months prior to the sale of the property. In addition, in the purchase contract, the seller specifically warranted that he received no notice from any governmental authority of any health code violations that had not been corrected.[9] *Id.* at 568. Had we been presented with a fact situation in which the Sellers had known of the presence of contamination but had warranted that there was no contamination, we too would have determined that the law supported a rescission of the contract. However, support for such decision would have rested upon the grounds of fraud, not lack of marketable title.

The grounds for the Buyers' claim that they could not receive marketable title is that they cannot transfer the property without a clean Phase I environmental inspection and that they may be exposed to litigation due to contamination. While it may be true that it will be more difficult to sell the property without a clean Phase I environmental inspection because of the inability of potential buyers to receive bank financing, we cannot agree with Buyers' claim that the property cannot be sold without a clean Phase I report. There are alternative means of financing available, such as those utilized here between the Sellers and the Buyers. Moreover, we are reluctant to hold that marketable title cannot be conveyed because one potential buyer could not receive financing without a clean Phase I report.

Addressing the Buyers' claim that they would be subject to litigation because of the potential contamination, it would be a stretch to declare that title was not marketable because of the future potential of litigation resulting from contamination. We recognize that the definition of marketable title upon which Indiana courts have traditionally relied include that a purchaser will "not [be] bound to accept a doubtful title, *or one that would likely be involved in litigation." Staley,* 404 N.E.2d at 635 (emphasis supplied). However, this does not mean that property is transferred free of the risk of *any* potential litigation, but from litigation arising out of problems of unclear title. As stated in *Kenefick,* when addressing marketable title, we are to concern ourselves with issues that affect the *possessory* title of the owner. 64 Ind.App. at 565, 116 N.E. at 323. This most likely encompasses issues such as covenants, easements, leases,

---

9. The contamination which was present upon the property was the result of a transformer leaking polychlorinated biphenyl ("PCB"). The Illinois Appellate Court apparently accepted the fact that the presence of the PCB amounted to notice that a health code violation had occurred.

liens, boundary disputes, gaps in the chain of title, and adverse possession. *See e.g., Wilson v. Elliott,* 589 N.E.2d 259, 261 (Ind.Ct.App.1992) (noting that oil and gas leases generally affect marketable title); *Staley,* 404 N.E.2d at 635–6 (discussing violation of restrictive covenant and effect on marketable title). To expand this list to include contamination, we would be moving away from protecting buyers who may not get the full use of the property because of someone else's claim to it to protecting every buyer who learns that the value of their newly acquired property is less than hoped for. Indeed, every piece of real property could be subject to litigation for some reason irrespective of title. We will not create a rule which allows buyers to avoid honoring a contract solely because the purchase is no longer economically feasible or wise because of the potential for litigation which does not affect a possessory interest. To protect themselves, buyers should utilize all resources available, including inspections, legal representation, and contingency clauses in contracts, in order to prevent harm to themselves from a property later being discovered to have a problem of contamination.

 Based upon these considerations, and recognizing that the authorities from other states are not consistent, we hold that marketable title may be transferred even if there is contamination upon the property which is to be conveyed.[10] While the presence or likelihood of contamination may affect the market value of the property, it does not affect title to the property.

### III

*Specific Performance*

 The Buyers also assert that even if the contract were enforceable against them, specific performance was not the proper remedy. They claim that specific performance was not requested, and additionally, that specific performance is not available to the vendor when the property can be resold.

 The decision whether to grant specific performance is a matter within the sound discretion of the trial court. *Ruder v. Ohio Valley Wholesale, Inc.,* 736 N.E.2d 776, 779 (Ind.Ct.App.2000). The judgment of the trial court is given deference because an action to compel specific performance sounds in equity. *Id.* It is a matter of course for the trial court to grant specific performance of a valid contract for the sale of real estate. *Stoll v. Grimm,* 681 N.E.2d 749, 756 (Ind.Ct.App.1997). To be enforced by specific performance, a contract for the sale of real estate need only be reasonably definite and binding as to its material terms. *Id.* A party seeking specific performance of a real estate contract must prove that the contract obligations of that party have been substantially performed or that an offer to do so has been made. *Ruder,* 736 N.E.2d at 779. As part of a specific performance decree, the trial court may award equitable compensation to adjust the equities of the parties. *Bohlin v. Jungbauer,* 615 N.E.2d 438, 439 (Ind.Ct.App.1993).

 At trial, Sellers' counsel asked Betty whether she was requesting that the Buyers "be required to specifically perform ... in other words pay you the balance owed...." Transcript at 35. In response, Betty stated, "Okay." *Id.* To the extent that a request for specific performance was required, this is sufficient.

---

**10.** This should not be read to condone activity by a seller who conceals the fact that property may be contaminated. Indeed, other remedies such as fraud are available to purchasers who are mislead into purchasing real property which is contaminated.

To support their assertion that specific performance is unavailable, the Buyers rely upon this court's decision in *Ridenour v. France*, 442 N.E.2d 716 (Ind.Ct.App. 1982). In *Ridenour*, a house which was the subject of a sales contract was destroyed by fire approximately one month after the parties signed the contract but before closing. This court noted that in the absence of an agreement to the contrary, the purchasers, the Frances, had become equitable owners of the property and assumed the risk of loss. *Id.* at 717. This court then determined that the trial court had erred in not ordering specific performance of the contract as requested by the vendors. *Id.* at 718. The Buyers construe this case to stand for the proposition that specific performance is available to a vendor only when the re-sale or foreclosure of the property is made difficult or impossible due to damage or loss. However, such a narrow interpretation of the case is unwarranted.

It is true that the number of cases in Indiana in which a vendor has been awarded specific performance of a contract is rather small. In addition to *Ridenour*, this court addressed the propriety of an award of specific performance to a vendor in *Salin Bank & Trust Co. v. Violet U. Peden Trust*, 715 N.E.2d 1003 (Ind.Ct. App.1999), *trans. denied.* At issue was whether the vendor was entitled to specific performance because she failed to complete her obligations according to the requirements set forth in an option to purchase certain real property. This court determined that the vendor was effectively relieved of her performance of a condition of the contract because the purchaser had defectively performed its duty under the contract. *Id.* at 1008. Because the vendor had been relieved of her duty to perform under the contract, we held that the trial court was within its discretion in awarding

specific performance of the contract to the vendor. *Id.*

One of the earliest cases to address whether a vendor could be awarded specific performance of a contract for the sale of real property was *Migatz v. Stieglitz*, 166 Ind. 361, 77 N.E. 400 (1906). In awarding specific performance of a real estate contract to the vendor, our Supreme Court stated:

"The equitable doctrine is that the enforcement of contracts must be mutual, and, the vendee being entitled to specific performance, his vendor must likewise be permitted in equity to compel the acceptance of his deed and the payment of the stipulated consideration. This remedy is available, although the vendor may have an action at law for the purchase money." 166 Ind. at 364, 77 N.E. at 401.

We have found no law which changes this time honored principle. Indeed, vendors traditionally have qualified for the remedy of specific performance of a real estate contract after a purchaser's breach. *See* 14 James H. Backman, Pow-ell on Real Property § 81.04[1][a] (2003). While the reasons for awarding specific performance to vendors may be less compelling than the reasons for awarding specific performance to purchasers following a vendor's breach, the remedy is available nonetheless. *Id.*

We also note that the contract which was agreed to by the Buyers and Sellers included terms on Sellers' remedies in the event of Buyers' default. According to those terms, Sellers could "[d]eclare the entire unpaid balance of this contract immediately due and payable, and in such event, Sellers may pursue whatever remedies, legal or equitable, are available to collect the entire unpaid balance of the purchase price." Appendix at 16–17. This clause indicates that the parties agreed

that specific performance was an acceptable and valid remedy. As a general rule, the law allows persons of full age and competent understanding the utmost liberty in contracting. *Cowper v. Collier*, 720 N.E.2d 1250, 1255 (Ind.Ct.App.1999), *trans. denied.* Contracts, when entered into freely and voluntarily, will be enforced by the courts. *Id.* Because the Buyers have made no claim that they did not enter into the contract freely and voluntarily, we will not invalidate a remedy for which the Sellers contracted. Based upon the foregoing, it was within the discretion of the trial court to order specific performance of the contract for the sale of the liquor store.[11]

## IV

### *Appellate Attorney Fees*

■ The Sellers request that they be awarded appellate attorney fees pursuant to the language of the contract and that this cause be remanded to the trial court for calculation of such. The trial court entered an award of attorney fees at the trial level.

■ According to the contract, the Sellers may collect for "reasonable attorney fees incurred by Sellers in enforcing any right" under the contract. Appendix at 17. When a contract provision provides that attorney fees are recoverable, appellate attorney fees may also be awarded. *Samar, Inc. v. Hofferth*, 726 N.E.2d 1286, 1292 (Ind.Ct.App.2000), *trans. denied; Cole v. Loman & Gray, Inc.*, 713 N.E.2d 901, 905 n. 4 (Ind.Ct.App.1999). We therefore remand to the trial court for a determination of reasonable appellate attorney fees to be recovered by the Sellers.

The judgment of the trial court is affirmed. We remand to the trial court for further proceedings in which to determine the amount of appellate attorney fees to be awarded to the Sellers.

SHARPNACK, J., concurs.

KIRSCH, J., concurs in part and dissents in part with opinion.

KIRSCH, Judge, concurring in part and dissenting in part.

I fully concur in the majority decision regarding the issues of fraud and marketable title; from its decision regarding specific performance, however, I respectfully dissent. I believe that specific performance of a real estate contract is proper only where the remedy at law is inadequate. While specific performance may be granted as a matter of course to the purchaser because real estate is unique, in the typical case[12] the seller's remedy at law in

---

11. A third argument raised by the Buyers is that the Sellers cannot recover because they have failed to mitigate their damages. The authority upon which the Buyers rely relates to mitigation of damages in situations other than the transfer of real property. While we agree that a non-breaching party must generally mitigate his damages, the remedy of specific performance does not lend itself to the mitigation of damages in the way that Buyers request. By nature, specific performance requires the parties to perform the contract, it does not require the non-breaching party to do something outside of the contract.

12. In some instances, we have affirmed the grant of specific performance to the seller where it was shown that the remedy at law will not suffice. Thus, in *Ridenour v. France*, 442 N.E.2d 716 (Ind.Ct.App.1982), specific performance was found appropriate where the house located on the property had been destroyed by fire after the risk of loss had passed to the buyers. Similarly, in *Salin Bank & Trust Co. v. Violet U. Peden Trust*, 715 N.E.2d 1003 (Ind.Ct.App.1999), specific performance to the vendor was found appropriate in a real estate option contract where the purchaser had possession of the real estate for a number of years and had significantly changed the character of the property incor-

the form of an action for money damages will be sufficient to fully compensate the plaintiff. I see nothing in the facts of this case to indicate that the sellers have an inadequate remedy at law to justify the grant of specific performance.

porating the commercial building which was the subject of the option contract into two other building which the purchaser owned.